MARIETTA WILKINSON YAKSTIS, Adm'x of the Estate of Darrell W. Wilkinson, Deceased, Plaintiff-Appellee, *v.* WILLIAM J. DIESTELHORST COMPANY, INC., *et al.*, Defendants-Appellants.

Fifth District   No. 77-484

Opinion filed July 3, 1978.—Rehearing denied August 3, 1978.

Randolph E. Schum, of Pope & Driemeyer, of Belleville, for appellants.

John Dale Stobbs, of Stobbs Law Offices, Ltd., of Alton, for appellee.

Mr. PRESIDING JUSTICE EBERSPACHER delivered the opinion of the court:

Defendants, William J. Diestelhorst Co., Inc., and William J. Diestelhorst, appeal from a jury verdict of $175,000 awarded against them in a wrongful death action brought by the estate of Darrell W. Wilkinson in the circuit court of Madison County.

Early on the morning of November 28, 1973, Diestelhorst called Darrell Wilkinson to ask Wilkinson to haul the company's Case 680C backhoe from Cottage Hills to Litchfield as a favor to him. Diestelhorst explained to him that the trucks Diestelhorst ordinarily used to transport the Diestelhorst Company equipment were not working and he needed the backhoe in Litchfield to repair a caved-in sewer line.

Wilkinson was independently employed as a logger. He was not in the business of hauling heavy equipment, but he did have a Miller Tilt-Top trailer suitable for hauling heavy equipment, and a truck big enough to haul both the trailer and the equipment loaded on it which he used in his own logging business. During the phone call, Wilkinson asked if there would be a backhoe operator there to load the backhoe, and was told there would be.

Wilkinson agreed to do the favor for Diestelhorst even though it might make him late for another appointment. He and a friend, Ed McCormick, then drove to the location of the backhoe. McCormick came along because he was going to ride with Wilkinson to his other appointment and help Wilkinson pick up a log skinner for his lumber business.

When they arrived at the backhoe's location, the operator had not arrived. Wilkinson tried to load the machine and could not get it on the trailer because of early morning frost and mud. The operator who was employed by the Diestelhorst Company then arrived and loaded the backhoe with the rear end of the backhoe going first on the trailer. Mounted on the rear end of this backhoe was a boom which extended up into the air above the truck top. On the front of the machine was another scoop, or bucket.

Both McCormick and the operator, Baker, testified about how the machine was loaded, and the discussion between all three men concerning the height of the boom. Baker testified that he loaded the machine rear end first according to Wilkinson's instructions, that he asked the decedent how it looked, and Wilkinson said it (the boom) looked about 12 foot high. Further, Baker testified that the decedent did not indicate to Baker that he wanted the position of the boom modified, but if he had, he (Baker) would have obeyed Wilkinson's instructions.

Baker testified further that after the discussion relating to the height of the boom,

"Well, I got down off of the seat on the tractor [backhoe] and

walked the trailer back, stepped around onto the bucket on the ground, seen the front bucket wasn't sitting level on the trailer, so I started to get back on it and he [Wilkinson] said, 'Oh, That's alright.', and I said, 'No, I want it straight, and I got on it and straightened the bucket out flat, the front bucket'."

Then, according to Baker, he saw a chain put on the equipment to secure it, and left. At no time did anybody discuss the route Wilkinson was to take. The next time Baker saw the truck was just as it was getting onto Interstate 55. Baker was following in his car, observed that the load was riding well, and went on past the truck to Litchfield. When the truck did not appear in Litchfield within a reasonable time, Baker drove back out and saw the truck wrecked under an overpass with the cab on its roof and equipment scattered all over the highway. Darrell Wilkinson was dead, and Ed McCormick either was being transported to or was in the Litchfield Hospital.

According to Ed McCormick, the loading procedure was very different than what Baker said. McCormick agreed that Baker loaded the backhoe, and that there was a discussion about the height of the boom. McCormick testified:

Q. In any event, after you—after it [the boom] was put in that position by the operator, was there any discussion relative to the height of that boom?

A. Yeah. I even told Darrell it was too high; Darrell thought it was too high.

Q. What did the operator say, if anything?

A. The operator said it was O.K.

Q. Did the operator give you any indication as to whether or not he had done this before?

A. Yes.

Q. What did he say, if anything?

A. He says, 'It's low enough,' he says 'I've done it before, it's only going to Litchfield.' "

After this discussion, the backhoe was chained down, and the two men proceeded with the vehicle toward Litchfield. Wilkinson drove the truck onto Interstate 55, and stopped the truck once to check the load and the chains. He then drove along Interstate 55 at about 40 to 45 miles per hour. Wilkinson drove the truck under one overpass with no problems. When the truck reached the second overpass, the Route 4 overpass, the top foot of the boom on the backhoe struck the 14 foot 5 inch high overpass. The impact knocked the backhoe off the trailer. The trailer and truck were flipped over, and Wilkinson was trapped in the overturned cab. He was conscious and talking to McCormick for part of the 45 minutes it took

onlookers to right the cab, and extricate the occupants. Wilkinson died before he could be extricated.

At the time of his death, Wilkinson was 32 years of age and in good health. He had a wife, and an 11-year-old daughter. He had a logging business which was prospering as well as a saw business which he operated out of his home in his spare time. He had built his business up from one truck purchased on credit to a fairly large business with two trucks, a bulldozer, the Miller Tilt-Top trailer, and various other pieces of equipment. Although his wife helped by driving a truck, thus allowing him to stay in the field cutting timber, and loading the second truck, Darrell made all the business decisions and arranged the contracts with lumber mills.

The family was buying a 2-year-old home. There was testimony that Wilkinson was a good provider, and a capable business man. Plaintiff's economic expert, Dr. Leroy Grossman, testified to the effect that the economic loss due to Wilkinson's death reduced to present value was $264,916. The jury returned a verdict of $175,000 and answered a special interrogatory to the effect that Wilkinson was not guilty of contributory negligence.

Defendants bring this appeal on numerous grounds. First, they contend that the evidence demonstrates that Wilkinson was guilty of contributory negligence and consequently they urge that the lower court erred in denying defense motions for a directed verdict and for a judgment *n.o.v.*

■■ The contributory negligence of the decedent will be a bar to recovery in a wrongful death action. (*Maki v. Frelk*, 40 Ill. 2d 193, 239 N.E.2d 445.) Therefore, freedom from contributory negligence must be affirmatively pleaded and proved by the plaintiff. (*McIntyre v. Belt Ry. Co.*, 105 Ill. App. 2d 45, 245 N.E.2d 94; *Sweeney v. Matthews*, 94 Ill. App. 2d 6, 236 N.E.2d 439.) In contending that plaintiff herein failed to meet this burden of proof and that the trial court erred in denying the defense motions, defendants argue that the proper standard of review is that only evidence that was not controverted should be considered. We disagree.

■■ The applicable rule is as stated by our supreme court in the oft-cited case of *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14, wherein it was held that:

> "In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

Applying this rule to the instant case we find no error in the court's denial

of defense motions for a directed verdict and for a judgment *n.o.v.*

If the testimony of Ed McCormick is accepted as true, it is clear that after objecting to the height of the boom, Wilkinson was assured by the operator that "it's low enough. I've done it before, it's only going to Litchfield," and that the operator knew before the accident happened that Wilkinson was going to be traveling on Interstate 55 because the operator saw the truck and trailer on that highway, and drove on ahead of Wilkinson passing under the Route 4 overpass himself ahead of the truck.

Arguments by the defendants that Wilkinson knowingly encountered a known danger by using a road with overpasses when a second route without overpasses was available, and that using the first road shows lack of due care are not persuasive. It is true that he was aware the boom was high, but he was also relying on the operator's statement that it was "okay." Wilkinson had requested an operator to load the vehicle and the operator had been provided. Wilkinson was not a heavy equipment hauler. He was a logger doing a favor for a friend. Baker, the operator, testified that he took directions from Wilkinson as to how it should be loaded, and that if he'd been given instructions to lower the boom he would have done so. Then he testified that after he had finished loading, he noticed the front bucket was not level, that Wilkinson had said it was okay, and to leave it, and Baker had refused the instruction to leave it alone because, as he said, "No, *I* want it straight."

Whatever remaining caution and reservations Wilkinson may have been expected to have about the boom height would have been eased not only by the defendants' employee's statements, but also by the fact Baker saw him on the road to Litchfield, honked his horn at Wilkinson and went around him, and didn't try to stop him. Also there is the fact that the truck went through the first underpass before the Route 4 overpass without any trouble which would have also relaxed Wilkinson. There is ample evidence that Wilkinson was driving slowly, and stopped to check the load when he first got on the interstate, and that he otherwise exercised ordinary care.

■■ Contributory negligence is usually a question of fact for the jury. (*Geraghty v. Burr Oak Lanes, Inc.*, 5 Ill. 2d 153, 125 N.E.2d 47.) We find no basis to disturb their verdict in this case.

The next argument is defendants' contention that plaintiff's attorney engaged in improper conduct throughout the course of the trial and thereby deprived the defendants of a fair trial. We have reviewed the record in detail, and find no prejudicial conduct by plaintiff's attorney requiring a new trial. The case was fairly presented. Plaintiff's arguments to the jury were within the bounds of permissible conduct.

■■ Defendants further argue that photographs containing drawn-in arrows were impermissible and should not have been admitted into

evidence, and relies upon *Farmar v. Crane*, 32 Ill. App. 3d 383, 336 N.E.2d 607, for the proposition that it was improper to lead a witness through lines suggestively placed on an exhibit.

In *Farmar v. Crane*, the court said:

> "Crane argues that the trial court abused its discretion by permitting a magnetic blackboard to be used in a manner which allowed counsel to lead their witnesses. The use of such a blackboard rests in the sound discretion of the trial court. (*Sherman v. City of Springfield*, 111 Ill. App. 2d 391, 407, 250 N.E.2d 537, 545.) However, a blackboard may properly be used by the witness to aid his expression of the occurrence." (32 Ill. App. 3d 383, 389.)

We have reviewed the record, and do not agree that plaintiff's counsel used the arrows to lead the witnesses to an impermissible degree.

Defendants next argue that the decedent's income tax form for 1973 in its entirety should not have been admitted into evidence because it contained irrelevant information, was not competent evidence of income, and because plaintiff had on earlier occasions refused to produce the entire exhibits.

■■ Plaintiff's expert witness, Dr. Grossman, testified that he used the entire exhibit in analyzing the economic loss suffered because of decedent's death. Relevancy is established where a fact offered tends to prove a fact in controversy. (*Marut v. Costello*, 34 Ill. 2d 125, 214 N.E.2d 768.) We believe the tax return was relevant evidence of the economic status of the decedent, and would tend to show the economic loss caused by his death.

With regard to the question of the claimed failure to produce the entire exhibit, the record shows that the matter was discussed at the beginning of trial, plaintiff's counsel then offered to supply the exhibits, and defendant indicated he would use the copy in the court's file. That copy had been in the file for two years in response to another defendants' discovery request, and it had only two pages of the 10 or so pages of the 1973 return in it. In this case and from this record we cannot say that plaintiff did not comply with defendants' request in a proper manner.

Defendants next contend that the hypothetical question put to plaintiff's expert witness regarding the economic loss suffered because of the death of Wilkinson was improper and prejudicial.

In *Continental Illinois National Bank & Trust Co. v. Eastern Illinois Water Co.*, 31 Ill. App. 3d 148, 160, 334 N.E.2d 96, 107, this court discussed the evidence of expert witnesses. Quoting 32 C.J.S. *Evidence* §546 (63), at 267 (1964), we said:

> "The question whether the opinion of an expert is based on, and supported by, sufficient facts or evidence to sustain it is a question

of law for the court, and it is for the trial court to determine, in the exercise of its discretion, whether the expert's sources of information are sufficiently reliable to warrant reception of the opinion. The admissibility of expert opinion evidence is dependent on the laying of a proper factual foundation; expert opinion which is so completely lacking in proper foundation that it is worthless is not admissible, and where the evidence does not disclose the existence of sufficient data on which to base a reasonable judgment, the opinion is incompetent."

Upon review of the record, we do not believe the trial court abused its discretion in permitting Grossman's testimony in this case.

■■ The defendants further argue that the court erred in refusing to allow testimony of the custom of truck drivers and heavy equipment operators as to who controls the placement and manner of loading heavy equipment on trailers. They cite *Waters v. Chicago & Eastern R.R. Co.*, 13 Ill. App. 3d 661, 300 N.E.2d 521, for support. In that case we allowed evidence of custom and practice but said:

"Evidence of custom has also been inadmissible in the absence of proof that such practice was concurred by the opponent thereto. Here plaintiff submitted testimony of such concurrence as was the custom and practice of other railroads. *South Chicago City Ry. Co. v. Dufresne*, 200 Ill. 456, 65 N.E. 1075." 13 Ill. App. 3d 661, 669.

There was no evidence of concurrence in this case by Wilkinson. At trial, defendants argued to the court that proof of a usual method or practice in doing an act by those who are frequently and habitually required to do it is admissible in determining whether the conduct, is or is not negligent, and cited to the court *Fowler v. Chicago Railways Co.*, 285 Ill. 196, 120 N.E. 635. Defendants at trial contended that they had shown Wilkinson was "frequently and habitually required to load" heavy equipment. The testimony in this case does not support this contention. In fact, Diestelhorst admitted at trial that decedent had only hauled one other item for him in about seven years, and had never hauled one of Diestelhorst's backhoes. We think the offered evidence of custom was properly excluded in this case.

■■ Defendants argue that they were prejudiced when the court gave plaintiff's instruction to the jury which stated the plaintiff's theory of the case. The instruction stated that the plaintiff claimed the death of Wilkinson occurred while he was using ordinary care, and as a result of the defendant's negligence in failing to load the backhoe in a proper or safe position, and in failing to warn decedent the boom might be too high to clear the overpasses on the route decedent was to take, when defendant knew or should have known the boom would not clear. An instruction must have support in the evidence. (*Crutchfield v. Meyer*, 414

Ill. 210, 111 N.E.2d 142.) We think there was ample evidence to support the giving of this instruction.

Also, defendants sought an instruction to the effect that there was a statute in Illinois at the time of this incident that the maximum permissible height of a vehicle inclusive of load was 13 feet 6 inches high, and that if the jury found that the decedent violated the statute, the jury could consider that in determining whether Wilkinson was contributorily negligent.

■■ As events ultimately transpired, the load of course was over 13 feet 6 inches. However, Diestelhorst testified that such a permit was not required since the load was not intended to exceed 13 feet 6 inches in height. The instruction had no relevance to the case as it developed at trial and was properly excluded. *Shore v. Turman,* 63 Ill. App. 2d 315, 210 N.E.2d 232.

Defendants last objection is as follows. At the end of trial, and after the jury's verdict was rendered, the trial court allowed the plaintiff to join defendant William J. Diestelhorst personally in addition to his corporation, as a party defendant, even though the statute of limitations applicable had expired. Diestelhorst contends that such was error. We agree.

In her brief plaintiff explains her purpose in having joined Diestelhorst individually as a party defendant. According to her, immediately after the jury returned its verdict, a question arose of whether Diestelhorst's company had sufficient insurance to cover the judgment. Plaintiff thus sought to join Diestelhorst himself in order to assure payment. Plaintiff concedes that the question of payment has since been settled and that sufficient funds are in fact available. Nonetheless, citing sections 26 and 46(4) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, pars. 26 and 46(4)), plaintiff argues that the joinder was proper.

■■ Section 26 of the Act permits joinder of new parties even after judgment; however, this section extends only to necessary parties. (*Zieler v. Village of Oak Lawn,* 23 Ill. App. 3d 752, 320 N.E.2d 86.) It is undisputed, and we so find, that Diestelhorst was not a necessary party. (See *Keehner v. A. E. Staley Manufacturing Co.,* 50 Ill. App. 3d 258, 365 N.E.2d 275.) Consequently, this provision is inapplicable to the instant case. So too, section 46(4) is inapplicable since it is undisputed that the failure to have originally joined Diestelhorst, individually, was not inadvertent. (*Fields v. 6125 Indiana Avenue Apartments, Inc.,* 47 Ill. App. 2d 55, 196 N.E.2d 485.) Although as shown by the record, plaintiff was fully aware of Diestelhorst and of his factual involvement in the instant occurrence, long before both the trial and the expiration of the period of limitations, she chose not to join him until after trial and the expiration of the period of limitations. We find that this she could not do.

For the foregoing reasons, the judgment entered by the circuit court of Madison County against the William J. Diestelhorst Co., Inc., is affirmed and the judgment entered against Diestelhorst, individually, is reversed.

Affirmed in part; reversed in part.

G. J. MORAN and KARNS, JJ., concur.